OPINION
Appellant Margaret B. Shipley Child Health Clinic, Inc. (hereinafter "Shipley") appeals the September 29, 2000 Judgment Entry of the Stark County Court of Common Pleas affirming a February 3, 2000 Decision of the State of Ohio Unemployment Compensation Review Commission (hereinafter "Review Commission") disallowing review. Appellees are the Administrator, Ohio Bureau of Employment Services, nka Director, Ohio Department of Job and Family Services (hereinafter "ODJFS"), the Review Commission, and Annamarie D'Orazio-Skowronski.
 STATEMENT OF THE CASE AND FACTS
Shipley is a nonprofit corporation whose mission and purpose is to provide health care for infants, children, and adolescents in high risk, low income communities. Shipley hired Ms. Skowronski as a certified pediatric nurse practitioner on December 19, 1994. A certified nurse practitioner is a registered nurse who holds a valid certificate of authority issued under R.C. Chapter 4723. R.C. 4723.43 defines the scope of practice for a certified nurse practitioner to include the authority to practice in collaboration with physicians or podiatrists.
Ms. Skowronski was responsible for providing direct service for patients and families, as assigned, in collaboration with the staff pediatricians and the medical director of Shipley. As stated in Ms. Skowronski's performance evaluation, she was required to:
 9. [Recommend] prescription medication after consulting with staff pediatrician(s) and or following standing orders in the clinic PNP prodical book.
 11. [Assist] in development and implementation of a health care plan collaboration with appropriate disciplines or agencies as needed. [Make] appropriate referrals as needed.[1]
In November 1998, Lori Inskeep, Shipley's Executive Director, gave Ms. Skowronski a verbal warning regarding unauthorized referrals. Ms. Inskeep had been informed a hospital had received a referral written by Ms. Skowronski for a hospital test. Tr. at 10. Because the hospital was not "inclined to honor her referrals. . .[,]" Ms. Inskeep advised Ms. Skowronski to cease making such independent referrals. Tr. at 10-11.
On April 21, 1999, Ms. Skowronski referred a patient to a specialist. This referral was made on a form entitled Mediplan Referral Form. Under the section "physician requesting referral," Ms. Skowronski wrote her own name and noted she was a certified nurse practitioner. As a result of this conduct, Ms. Inskeep wrote a warning letter to Ms. Skowronski on April 22, 1999. The letter stated Ms. Skowronski was not permitted to make outside referrals until a standard care agreement and practice protocol had been established.
In July of 1999, Nelda D. Santos, M.D., a physician for the clinic, informed the clinic administration Ms. Skowronski had written a prescription for Chloral Hydrate, a narcotic substance, without Dr. Santos' authorization. As a result, Shipley confronted Ms. Skowronski and asked that she either tender her resignation or be terminated. On August 17, 1999, Ms. Skowronski tendered her resignation effective September 30, 1999.
On October 7, 1999, Ms. Skowronski filed an Application for the Determination of Benefit Rights. On October 29, 1999, an Administrator of ODJFS made an initial determination Ms. Skowronski was discharged due to insubordination and suspended her benefit rights. Ms. Skowronski requested reconsideration and the Administrator issued a re-determination affirming the initial determination.
Ms. Skowronski appealed the re-determination to the Review Commission pursuant to R.C. 4141.28(O). A hearing officer conducted a hearing on December 14, 1999. Shipley presented the testimony of Lori Inskeep, and documentary evidence, including the affidavit of Dr. Santos, and the affidavit of Charlyce Wallington, M.D., also a staff pediatrician at Shipley. Ms. Skowronski was the only witness to testify on her behalf.
After considering the evidence in the record and the credibility of the witnesses, the hearing officer reversed the Administrator's re-determination. In its December 21, 1999 Decision, the hearing officer found:
 The facts do not establish any insubordination by claimant. If she wrote the prescription for the Chloral Hydrate in question, it appears from the evidence that she did it with the authorization of Dr. Santos. There does not appear to be sufficient fault on her part to justify her discharge. Therefore, it will be held that she was discharged without just cause in connection with work.
 Id. at 3.
On January 4, 2000, Shipley filed an appeal from the December 21, 1999 Decision. In a Decision mailed February 3, 2000, the Review Commission disallowed Shipley's request for further review.
On February 28, 2000, Shipley filed an appeal from the Review Commission's February 3, 2000 Decision, to the Stark County Court of Common Pleas. The trial court accepted briefs from both parties and reviewed the evidence. In a September 29, 2000 Judgment Entry, the trial court affirmed the February 3, 2000 Decision of the Review Commission, permitting Ms. Skowronski to participate in unemployment compensation. It is from this Judgment Entry appellant prosecutes its appeal, assigning the following as error:
 I. THE TRIAL COURT ERRED BY HOLDING THAT THE DECISION OF THE UNEMPLOYMENT REVIEW COMMISSION WAS NOT UNLAWFUL, UNREASONABLE, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, OR CONTRARY TO LAW.
 A. THE TRIAL COURT IGNORED UNDISPUTED EVIDENCE INDICATING THAT SKOWRONSKI ILLEGALLY PRESCRIBE [SIC] DRUGS FOR YOUNG CHILDREN.
 B. THE REVIEW COMMISSION ACKNOWLEDGED THAT SKOWRONSKI WROTE A PRESCRIPTION FOR A NARCOTIC KNOWN AS CHLORAL HYDRATE.
 C. THE EVIDENCE PRESENTED TO THE REVIEW COMMISSION OVERWHELMINGLY DEMONSTRATED THAT SKOWRONSKI ILLEGALLY PRESCRIBED DRUGS ON SEVERAL OCCASIONS.
 D. SKOWRONSKI MADE UNAUTHORIZED REFERRALS KNOWING THAT SUCH ACTIVITY WAS PROHIBITED BY BOTH THE CLINIC AND OHIO LAW.
 I
In appellant's sole assignment of error, it maintains the trial court's decision was unlawful, unreasonable and against the manifest weight of the evidence. Specifically, appellant argues Ms. Skowronski illegally prescribed medications on several occasions, and made unauthorized referrals. Appellant maintains this evidence was undisputed, and constituted fault on the part of Ms. Skowronski, permitting Shipley to terminate her for just cause. We disagree with appellant's contentions.
In Tzangas, Plakas and Mannos v. Ohio Bur. of Emp. Serv. (1995),73 Ohio St.3d 694, the Ohio Supreme Court found, pursuant to R.C.4141.28(0), an appellate court may reverse the Review Commission's just cause determination only if it is unlawful, unreasonable or against the manifest weight of the evidence. The Supreme Court found this same standard applies at each judicial appellate level, which includes both the Court of Common Pleas and the Court of Appeals. Id. at 697.
Under this standard, no reviewing court is permitted to make factual findings or decide the credibility of witnesses, as determinations of purely factual questions are primarily reserved for the Review Commission. Irvine v. Unemp. Comp. Bd of Review (1985), 19 Ohio St.3d 15;Brown-Brockmeyer Co. v. Roach (1947), 148 Ohio St. 511. Reviewing courts cannot usurp the function of the trier of fact by substituting their judgment on the facts and credibility of witnesses for that of the Review Commission. Simon v. Lake Geauga Printing Co. (1982), 69 Ohio St.2d 41.
A decision of the Review Commission supported by some competent, credible evidence going to all the essential elements of the controversy will not be reversed by a reviewing court as against the manifest weight of the evidence. Angelkovski v. Buckeye Potato Chips Co. (1983), I I Ohio App.3d 159. The Review Commission's decision cannot be reversed simply because reasonable minds might reach different conclusions. Irvine at 18.
R.C. 4141.29(D)(2)(a) governs the payment of benefits after a termination for just cause. This section provides as follows:
 (D) Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits under the following conditions:
* * *
 (2) For the duration of his unemployment if the administrator finds that:
 (a) He quit his work without just cause or has been discharged for just cause in connection with his work.
* * *
Just cause has been defined as "that which, to an ordinary intelligent person, is a justifiable reason for doing or not doing a particular act."Irvine, supra at 17, quoting Peyton v. Sun TV (1975), 44 Ohio App.2d 10,12. A discharge is considered for just cause when an employee's actions demonstrate an unreasonable disregard for an employer's best interests. The critical issue is not whether the employee has technically violated some company rule, but whether the employee by his actions demonstrated an unreasonable disregard for his employer's best interests. Kiikka v.Ohio Bur. of Emp. Serv. (1985), 21 Ohio App.3d 168. Courts have found that an employee's behavior, while not requiring misconduct, does require some degree of fault. Sellers v. Bd of Review (1981), 1 Ohio App.3d 16
1.
In Tzangas, supra, the Ohio Supreme Court states:
 The Act does not exist to protect employees from themselves, but to protect them from economic forces over which they have no control. When an employee is at fault, he is no longer the victim of fortune's whims, but is instead directly responsible for his own predicament. Fault on the employee's part separates him from the Act's intent and the Act's protection. Thus, fault is essential to the unique chemistry of a just cause termination.
 Id. at 697-698.
Accordingly, the issue before this Court is whether the Review Commission's determination Ms. Skowronski was terminated without just cause was unlawful, unreasonable or against the manifest weight of the evidence. We will address each of appellant's contentions in turn.
In subsections A, B and C of appellant's sole assignment of error, it maintains the Review Commission ignored undisputed evidence indicating Ms. Skowronski illegally prescribed medications on several occasions. Therefore, appellant contends the evidence reflects Ms. Skowronski was at fault in her termination.
Appellant asserts the uncontroverted affidavit testimony of Drs. Santos and Wallington required the hearing officer to find Ms. Skowronski had illegally completed prescriptions, exposing Shipley to liability and justifying her termination for cause. In her affidavit, Dr. Santos testified:
 Apparently pediatric nurse practitioner [Ms. Skowronski] had written a prescription for Chloral Hydrate for a patient of [Shipley]. This prescription was written without my authorization.
Dr. Wallington's affidavit contained similar allegations:
 * * *[Ms. Skowronski] called in prescriptions for antibiotics, steroid nasal spray and an antihistamine. I was not consulted on the diagnosis or any of these prescriptions, nor are these medications part of a standard list of over-the-counter medications that may be phoned in by the triage nurse. * * *
 [Ms. Skowronski] illegally used my name, my medical professional license, and my prescriptive privileges. * * *
Appellant contends these allegations were unrefuted, and in fact, strengthened by Ms. Skowronski's own testimony. Those portions of transcript, along with the testimony completing the exchanges, state as follows:
 Q. Well, did you sign a prescription for a narcotic drug?
 A. I don't know. I don't know if I did or not. I do not recall doing it. At the time that I saw this patient, I consulted with Dr. Santos, the patient needed to go to physical therapy, he needed a CT scan and with CT scan, they need Chloral Hydrate, which is a medication to sedate him, so that they can perform the CT scan. She agreed with everything.
Q. Who agreed with everything?
 A. Dr. Santos agreed with all recommendations. I may have signed both of our names to the physical therapy and to the CT scan, but I can't imagine that I would have done it to a prescription. I assumed that the nurse would have given them to the physician to sign before the patient had them.
 Q. Okay. During your entire — you say you don't recall. During your entire period of employment, there, did you ever sign a prescription by yourself?
A. With a physician?
Q. For any — —
A. No. No. It's not allowed.
Q. Okay.
 A. It's my license. We're not allowed to prescribe in Ohio.
 Q. All right. So, your testimony, then, is you did not sign this — —
A. I can't imagine that I did. No.
* * *
Q. Okay. Chloral Hydrate is a narcotic, right?
A. Right.
 Q. Okay. Do you have the authority as a pediatric nurse practitioner to prescribe narcotics?
A. No.
* * *
Q. Okay. Chloral Hydrate is a narcotic, right?
A. Right.
 Q. Okay. Do you have the authority as a pediatric nurse practitioner to prescribe narcotics?
A. No.
* * *
 Q. So — — and you're not authorized to prescribe prescriptions, are you, — narcotic prescriptions, are you?
A. In my name alone, no, I'm not.
* * *
 Q. And on August of 1999, Dr. Charlese (sic) Wallington became aware of another incident where she discovered that you prescribed antibiotics without her authorization. Are you aware of this?
A. No.
 Q. Okay. Well, I'm going to provide you with an affidavit. Is this your handwriting where — in reference to this incident of — that Dr. Wallington refers to. Is this your handwriting where antibiotics and steroid nasal spray and antihistamines are prescribed?
A. Yes.
* * *
 Q. — is it your testimony that anything that you've signed with a doctor's name was done after consulting with them and getting their authority, even in this case if it happened?
A. Please, repeat that.
 Q. If your signature is on a document, the ones that you've seen and these other ones that you haven't seen before today, is it your testimony to the Hearing Officer, that you wouldn't sign a doctor's name without consulting with a doctor and getting their authority — —
A. Correct.
 Q. — to proceed in the manner that would be authorized by that doctor?
A. Correct.
* * *
T. at 33-34, 39, 41-42, 44.
After considering all the evidence, the hearing officer found Ms. Skowronski wrote the prescription for Chloral Hydrate with the authorization of Dr. Santos. The hearing officer did not find sufficient fault to justify Ms. Skowronski's discharge.
After reviewing the record, including the above quoted passages, we find Ms. Skowronski's testimony was in conflict with the affidavit testimony of Drs. Santos and Wallington. As such, the hearing officer was forced to make a determination of the veracity of the various statements based upon the documentary evidence and the credibility of the witnesses. We find the hearing officer's determination was supported by some competent, credible evidence. As such, the Decision was not unlawful, unreasonable, and was not against the manifest weight of the evidence. Accordingly, subsections A, B, and C are overruled.
In subsection D, appellant maintains Ms. Skowronski was insubordinate in completing a patient referral for a podiatrist. Appellant maintains Ms. Skowronski had been warned and was not permitted to refer patients without physician approval.
However, Ms. Skowronski testified before the hearing officer:
Q. Okay. You filled out this Mediplan referral form?
A. Yes.
Q. Were you authorized to make referrals?
A. Yes.
Q. How?
A. I would — —
Q. By whom?
 A. I would consult with the physicians and if they agreed by [sic] it, then the referral was given. Previously, the referrals had been given by phone number. If I saw a child that needed to see an ear specialist, I would talk with the physician, they would agree, and we would give the mother the physician's the specialist's phone number. And they would call and make their own appointment and that's how referrals were done. Starting recently, is when paperwork had to be filled out because patients were on HMOs.
Q. All right. Which doctor agreed to this referral?
 A. Dr. Santos. I spoke with her prior to the referral and she agreed, she wrote a prescription for the patient because he was having an infection at the time regarding that procedure and she signed the prescription and agreed that he needed to go see the podiatrist.
 Q. Now, do you know of any problem occur — occurring as a result of this referral?
A. No.
 Q. Now, when you made this referral, did you identify yourself as a physician requesting referral?
 A. I identified myself as the provider when the nurse asked me to fill it in. The nurses at the clinic, typically, fill in the referrals and have the provider sign the referral. And one of the registered nurses ask that I fill that in because it was my patient. I put NDCRNP after my initials indicating that I was not a physician.
* * *
T. at 30-31.
Faced with conflicting evidence as to Ms. Skowronski's responsibilities as a nurse practitioner to making relative referrals, the hearing officer, and subsequently the Review Commission apparently found Ms. Skowronski's testimony to be credible. Certainly, if believed, Ms. Skowronski's testimony provided competent, credible evidence on this issue. Accordingly, we agree with the Stark County Court of Common Pleas the Review Commission's decision was not unlawful, unreasonable or against the manifest weight of the evidence.
Appellant's sole assignment of error is overruled.
The September 29, 2000 Judgment Entry of the Stark County Court of Common Pleas is affirmed.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.
 ___________ Hoffman, J.
Hoffman, J. Edwards, P.J. and Gwin, J. concur.
[1] In an evaluation dated "6/99" Ms. Skowronski received a score of 3 out of a possible 5 on the above-referenced number 9, and a score of 4 out of a possible 5 on number 11.